Our council here in Daisadeghi v. Equinox Thank you. May it please the Court. My name is Thomas Riccotta. I represent the plaintiff appellant in this matter. We are appealing. You're not reserving any time for rebuttal? If I could, I would like to reserve two minutes for rebuttal. All right. Then you'll only have five minutes for your main argument. Absolutely. We're appealing the lower court's decision granting summary judgment on the plaintiff appellant's discrimination claims. He brought two clauses of action, a hostile work environment claim as well as a claim relating to his termination, which he alleged was discriminatory in nature. We believe the lower court erred in not finding the facts in a light most favorable to the plaintiff on a motion for summary judgment, which, as Your Honors are aware, is necessary and all reasonable inferences are to be determined in a light most favorable to the plaintiff. I'll start with the hostile. The termination claim. You're going to start with hostile environment? I can discuss. I was going to say, what do you have on the termination claim? Because the record, including the lawyer's statements, seemed to make it crystal clear that he was fired because he was violating the policy on using the employee discount. So what we have in that regard is, again, it really focuses on the facts here. And what the facts here are is that the plaintiff has unquestionably testified that with respect to the use of the employee discount, number one. $10,000 worth of discounts that he gave to the lawyer in violation of the policy? Well, therein is the first dispute, which is what Your Honor said was he gave it. What he has routinely and regularly said is that it's not him that is giving it. They used his code. Well. However, the manager. I didn't mean that he was giving $10,000 out of his pocket. I meant that he was allowing his code to be used so that his lawyer could get $10,000 in discounts. But he was, when we say he was allowed. Is that disputed? It's not disputed that this client was being given discounts using his code. With his knowledge? With both his knowledge and his manager's knowledge. And everyone else's knowledge. No, but the e-mail, the e-mail made clear. The Harris e-mail said even if the general manager knows, you can't do this. It made reference effect. We understand this is going on. General managers may be approving this, but you can't do it. And then even after that, your client did another $3,000 worth of discounts. And then lied about it by saying that he didn't do it after the e-mail, right? So a review of my view of the Harris e-mails, what the Harris e-mail said was that you're not permitted to engage in this conduct in an unethical manner. You're not allowed to provide discounts where you're doing without. You can't do it, period. It's not if you get approval of somebody's supervisor. It says you're not allowed to use it for a family or friends, period. There's no approval process. You can't do it. You're going to be terminated if you do this, right? Isn't that what that says? Throughout discovery and management, including Mr. Baktash, he indicated that this was a process that occurred where there were certain circumstances that it was acceptable. So. Let's talk about after the e-mail, though. After the e-mail, you don't have anybody who did this after the e-mail who, unlike your client, was allowed to do it, right? Your client was the only one, I think, who did it after the e-mail. Well, after the e-mail, my client, again, they used his code. The testimony that my client provided was there were times when he wasn't even present that they would process this under his code. So it's the idea and the fiction that my client has constantly been fighting against here is that this was his action that he was doing, whereas this was. Maybe you better turn to hostile environment. Maybe you were wise to try to do that in the first place. Go ahead. So with respect to the hostile work environment claim, we have to establish whether there was a severe or pervasive hostility based on his national origin. Now, here the lower court found that there wasn't, despite the fact that the lower court acknowledged that on a daily basis he was subjected to comments, relief. The name calling, the mocking, that has to alter the conditions of employment, right, before it becomes actionable under Title VII? Sure. And what evidence is there that the conditions of employment were altered? So the evidence is that on numerous occasions the environment made him so uncomfortable that he requested transfers to other locations. And while the defendant attempts to argue in the lower court, in our eyes erroneously limited the review of the request for transfer to the other locations. Well, he also testified that there were business reasons for asking a transfer. And so I agree he testified that he asked for the transfer as well because of the teasing. What is, is it like a mixed motive type thing? What does he need to show to speak summary judgment? Frank, Your Honor, I don't know of any law that says that if you're reporting a complaint of discrimination, that if you do it in conjunction with addressing legitimate other business issues that you have, that that somehow undermines or undercuts the actual complaint of discrimination and the statements of discomfort that those comments were making to you. He testified in his deposition that the discrimination caused him no, I emphasize, no mental anguish. No mental anguish that whatever occurred, how can he have, how can a rational jury find that he perceived this to be a hostile work environment based on his national origin? When he testified, he suffered no mental anguish as a result of it. Well, I think because that would be an issue, I think where that will be an issue or should be an issue is when it comes to the idea of discussing damages if you got to that point. It's not an issue of whether or not a rational jury could find that he perceived this to be hostile. If he says, I didn't suffer any mental anguish as a result of this. And the other thing that I wanted you to address was when he does, after he's fired, he calls the hotline, right? Yes, sir. And he's reporting the discrimination. He doesn't even mention Mr. Dakeshi, who he asserted every day was saying these things. He didn't mention that after he'd been terminated. And he was asked in his deposition, why didn't you mention that? And he said he forgot. So, again, couldn't — how could a rational jury find that this is a hostile environment when it was so uneventful that he forgot to mention it to the hotline when he was calling about his discrimination? I think that highlights there's a factual issue there, and that might go to his credibility, Your Honor. But what he testified to during his deposition was that Mr. Bakteshi did engage in this conduct. I can surmise as to why he might have mentioned Harrison and not Bakteshi, which is Harrison was the one that had just fired him and he was upset and he had just dealt with him. But that's really more speculative. And at the end of the day, it still highlights why there's a factual issue at play here. He testified to Bakteshi having made daily comments. He testified to Harrison having made weekly comments. These were relating to his national origin, the idea that he did not suffer, and the context of the not suffering emotional trauma, that related more towards when he was being questioned about how he has suffered and whether he subjected himself to treatment for anything relating to that. However, he did testify to numerous times telling people that he wanted a transfer because this was not — he was not — this was not making him — he was uncomfortable with what was happening here. So he has testified to, and there is evidence, that the comments impacted him. Even if at his deposition he, you know, he denied having to seek some significant treatment for that, like I said, I would argue that that would be more towards at the tail end of the case, if the plaintiff was successful, arguing what damages he suffered versus was he subjected to an environment that was severe and pervasive that impacted him, which I think there — I think there is a lot of evidence that he did not have to seek a transfer. He — even at his deposition, he used the words may have. He was asked, you know, did you mention these things to Caporuso or Gu, G-U? And I think he said he may have. So does that create a record that he was complaining about these things as opposed to just general business reasons for transfer? I think it does. I think it does because if you look at that in his total and his prior testimony, he previously had his deposition testified to explicitly making these complaints to Caporuso. Then later on in his deposition, he was asked if he had discussed these things with Caporuso. And he does use the term I may have or may have in the conjunction with his answer. Again, this is not — this is someone whose English is not his first language. But he then is asked a follow-up question as to — which relates back to whether he, you know, essentially confirms the things that he talked about earlier with the affirmative. So I think in conjunction with saying — using the term may, he's then asked a follow-up question that then reaffirms that which he previously said. But again, I think this dynamic is, again, why I think the purpose of summary judgment is to vet out these cases where there is no factual issue at play, intent is not at issue. And here, I just — I think that the lower court erred in finding that there are no facts upon which a juror can say he was subjected to a — to improper national or marginal-based comments that they — Roberts, let's hear from the EEOC. And you have two minutes for about a minute. Sloan. Good morning, Your Honors, and may it please the Court. Barbara Sloan from the EEOC. Our concern with this case really focused on two things. One, the Court's — both of them issues that the Court decided as a matter of law instead of leaving it to a jury. The first is the requirement that there be animus. As we said, F in Persian could sound hostile to a jury. But aside from that, the animus simply is not relevant in a hostile work environment case. The question is whether — I mean, it's a subjective, it's an objective test, and the focus is on the conduct, not on the underlying motivation. Al-Khalili really clarified that by saying — Which part is subjective, then? I beg your pardon? Which part is subjective? They're both — whether it's severe or pervasive is subjective and objective. Objective from the point of view of the plaintiff? Right. This Court said, I think, in Sciano, that the question is whether the conduct is of a quality or quantity such that a reasonable person would find, and the plaintiff did find, that the work environment was altered for the worst. The plaintiff testifies in his deposition, I had no mental anguish over this. Why couldn't this be — you know, this wouldn't be the same for any type of general proposition. It's just in this particular case, under these circumstances, the way he interacted with Mr. Bekheshi, that it didn't — it wasn't — it didn't alter his conditions of employment. He was performing well. He had no mental anguish. So it would be a very fact-specific decision based upon his own testimony. Well, the — this Court, I think, in, for example, Al-Lacino, said the fact that an individual is seeking a transfer or is even contemplating a transfer suggests that he or she is not happy with his working environment. And the — remembering here that the conduct started in 2014. Isn't there evidence in the record that the transfer was for other reasons, as well as Judge Chin's best mixed motive, that it wasn't as if the only reason he was asking for a transfer was related to this, right? That's true. But that's — that, if anything, that's an ambiguous issue, Your Honor, and the task of disambiguating facts are for the jury, not for the Court. You said a moment ago that — that animus was irrelevant? It's — yeah, for — I mean, it's — it doesn't the — the conduct have to be motivated by race or national origin? Oh, it has to be based on race or national origin, but it doesn't have to be motivated by hostility to that national origin. Animus. Okay. I get it. Animus — I mean, when we say animus, the motivation is different, not necessarily hostility. It could be teasing and fun, but still sufficient animus, I guess, is your — is your position? Yeah. If a reasonable person and the plaintiff found it hostile or abusive. So, I mean, as the Supreme Court has held, as we have held many times, Title VII is not a civility code. So we have here teasing, name-calling, that's what it seems to be. When does it become a violation of — of Title VII? Well, that would be a jury question, Your Honor, but we have not just simple teasing, Your Honor. Well, I don't think it's just a jury question. I mean, we have to give guidance to — the jury's going to know when does it become a violation of Title VII and when is it simply, you know, acting in an uncivil manner. Well, what we have here — What do we say to the jury? Here we have two supervisors, the first and the second-line supervisor, making fun of this guy's name, his grammar, his accent, things that are kind of intrinsic and based on national origin, in front of his peers and his subordinates, which is humiliating. Even Solano thought so. It happens on a daily, weekly, monthly basis. It's constant, continuous. It's pervasive. A jury could find that anyway. But it has to alter the conditions of employment, right? Yes. But it doesn't have to reduce him to a puddle of — of tears. He can — I mean, if he's going to say, no, I'm going to do the best I can no matter what's going on here, then that doesn't mean it's not — He can be unhappy without suffering mental anguish. Well, mental anguish is kind of a term of art, isn't it, Your Honor? They didn't say, were you upset by this? They said, did you suffer mental anguish? And he said, no, I didn't suffer mental anguish. I didn't — and a lot of people don't seek mental health treatment, so that's really not very persuasive either, although it would be a fact the jury could consider. Thank you. We'll hear from the other side. Good morning to the court. Patrick McPartland for the appellate equinox. I will jump right to hostile work environment unless the court has any questions on the unlawful termination claim. But the court is correct, and I'm going to kind of repeat a little bit of what's been said already, that there are two components here for any hostile work environment claim. It has to be both subjective and objective. We don't even need to get to the objective, but it fails on both points. By plaintiff's own admission, as the court has noted, he admitted that he did not suffer any mental anguish whatsoever. All right, so no mental anguish, but there is evidence that he was unhappy enough to ask for a transfer,  That's not exactly accurate, Your Honor. So he testified, and his testimony went back and forth throughout his deposition. I took his deposition. He testified that he had two meetings regarding transfers, one with Mr. Caporuso. He simply testified with Mr. Caporuso that he may have mentioned to Mr. Caporuso that Mr. Harrison had elongated his name during weekly conference calls. The elongation of his name. He also testified that he talked to Mr. Gu about a transfer because of the mimicking of his accent. Right. He mentioned that in the context of, as Judge Spat pointed out, a business-related reason. The principal reasons that he requested these meetings was because he said Mr. Harrison was, quote, unquote, not inspiring, and he said that Mr. Bektashian. But he says, I have it at 221, yes, I told him that as Gu, I would like to get a transfer regarding this. You know, he mimicked my accent. I did tell him that. Right, Judge. And that's the one, that is the one sole area of evidence against the weight of other evidence that this had no subjective effect on Mr. Dozedeguy. I mean, he never felt physically threatened. Were you supposed to be weighing the evidence? Well, no, Judge. I mean, I think any court in a hostile work environment claim rolls its sleeves up a little bit to see whether or not the total, you know, realistic view of the demanding standards of Title VII. And this case doesn't add up. I mean, we have an employee here who admits he didn't suffer any. We have evidence of daily, weekly name-calling, mocking the accent. Would you agree that there's evidence of pervasive conduct? No, I would disagree with that. You don't think daily or weekly name-calling and teasing is pervasive conduct? That was plaintiff's own testimony, Judge. It's completely uncorroborated. I mean, it's a sworn testimony. That's on summary judgment, right? Yeah, but there needs to be corroboration under the Second Circuit law. All right. And I have a couple of cases here. I mean, Davis-Belle v. Columbia, which is a Southern District case, as well as O'Neill v. State University of New York. Is there a Second Circuit case that says there must be corroboration of a plaintiff's sworn testimony to defeat summary judgment? Well, these cases, the no. There's a Second Circuit case that says that. Not explicitly, but these cases rely. There's a Second Circuit case that says that implicitly. Yes. The judges tend to rely on the Torres case. Okay. And I actually have the site over by my back. That's all right. Okay. Thanks. So just recounting, again, subjectively, this is also an employee who testified that. If we disagree with you, if we were to conclude that a reasonable jury could find on this record pervasive conduct, that is name-calling, teasing, then what? You still win because? Well, I think because all the other factors are in, all the other factors that you look at for a hostile work environment claim weigh heavily in Equinox's favor, that he hasn't met his Title VII standard here. I mean, every single, every single, but for his own conclusory and uncorroborated testimony, every other factor easily goes Equinox's way here. You're saying that as a matter of law, we have to decide that rather than it's fact. Yes. Despite the fact there is some evidence to the contrary. Correct. That's correct, because the test under Title VII is to get a realistic view of the workplace. And there is some rolling up of the sleeves in that. I'm asking about what our role is, not what the role is. Yes. The role of the court is to get a realistic view of the workplace. They apply these five factors, and they determine, you know, based on these five factors and all of the evidence in the record before them, whether or not it's met that standard. How do we, what do we do with the evidence? There's some evidence, and I agree with you, there's conflicting evidence, but there's some evidence that he asked for a transfer because of the name calling. Why does that evidence not create an issue of fact on whether the conditions of employment were altered? Because it's the totality of the circumstances. It's all the evidence. I mean, it's really significant to me that Mr. Bektashi, plaintiff now wants to lean back on an offhand comment that he made about Mr. Bektashi during a request for a transfer, where he was there for principally business reasons, as Judge Spat originally recalled. And then yet on the day his employment is terminated, he calls the ethics hotline for the first time, and he doesn't even mention Mr. Bektashi. And when he's asked, why didn't you mention Mr. Bektashi during that call, he says he forgot. So subjectively, how significant can Mr. Bektashi's behavior have been that when you actually finally call to quote-unquote report this purported behavior, you completely forgot about it? On the day your employment was terminated, you completely forget about it? Okay. Thank you. Thank you. We'll hear the rebuttal. So on the point that we just discussed, I think that the analysis of why Mr. Disadehi forgot or didn't mention Mr. Bektashi is exactly what we're sort of arguing here, which is that's really a factual and credibility determination, particularly when he testified during this case to comments that were made by Mr. Bektashi. We're trying to identify if there are issues and credibility determinations for a jury to make, not make them, which is what I think the Court did and which counsel is, I think, asking you to do when he highlights, well, why wouldn't he have mentioned him on that call? And that, I just think, is simply inappropriate for the purpose of summary judgment. But I do want to address the subjective and objective standards, because those are absolutely the standards. But the idea is, is there evidence in this record to establish that Mr. Disadehi was subjectively offended by the comments and conduct that he was subjected to? And, frankly, there's an admission. Is being offended enough? I think being offended can be enough, absolutely. But here what you have is you have, and it's on the appendix pages, it's 231 through 233, but I'll highlight 233 when he's talking about his complaints to Mr. Caporuso. He says, I told him, you know, Josh, just I would like to get transfer. I do not want to be there anymore. I feel like, you know, he bothering me a lot. It's hard to work here because all that situation happened. And then they went on to have, and that was in the context of him talking about him making fun of his accent. Right before that, he said, well, I did told him, you know, regarding my name, making fun of my name on the conference call. That was literally the testimony right preceding what I read before that. So there's no question on the record here that Mr. Disadehi was upset and bothered by and it impacted his ability to do his job that on a daily basis and weekly basis, he was either being called an effing crazy Persian or had his name mocked and mimicked on a call with the region, with a bunch of other regional managers, thereby negatively impacting his reputation before his colleagues. Objectively, I just don't see how a court on summary judgment can say objectively the record here of the comments and the conduct could not be potentially perceived by a reasonable person as sufficiently hostile, severe or pervasive to create a hostile work environment. So on a whole, I just think as it relates to the hostile work environment claim, there is absolutely sufficient evidence in the record to establish that claim and warrant it going before a jury. And we would respectfully request that the court reverse at least on that claim and remand it for trial so a jury can render these credibility determinations. Thank you. Thank you very much.